IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 23 CR 595 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| JORDAN COOK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Defendant Jordan Cook is charged with one count of being a prohibited person in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) prohibits possession of firearms by individuals who have been convicted of a felony. Defendant moves to dismiss the indictment, claiming that the pending charge violates his rights under the Second Amendment to the United States Constitution. For the reasons discussed below, defendant's motion to dismiss the indictment (Doc. 17) is granted.

## BACKGROUND

Defendant was arrested on April 10, 2023, and is charged with unlawful possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) prohibits the possession of firearms by individuals convicted of felonies, or any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year." Defendant has a criminal record that includes three prior felony convictions, and a federal grand jury returned an indictment against defendant on November 9, 2023, with one count of unlawful possession of a firearm.

On December 14, 2023, defendant filed the instant motion to dismiss the indictment based on an alleged violation of his rights under the Second Amendment of the United States

Constitution. He raises the issue based on the Supreme Court's ruling in New York Rifle &

Pistol Assn. v. Bruen, 142 S. Ct. 2111 (2022) ("Bruen"), and the Seventh Circuit's ruling in

Atkinson v. Garland, 70 F.4th 1018 (7th Cir. 2023) ("Atkinson").

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia,

being necessary to the security of a free State, the right of the people to keep and bear Arms,

shall not be infringed." U.S. Const. Amend. II. In District of Columbia v. Heller, 554 U.S. 570

(2008), the Supreme Court determined that "the right secured by the Second Amendment is not

unlimited." Id. at 626. In dicta, the Court cautioned that its decision did not cast doubt on

"longstanding prohibitions on the possession of firearms by felons." Id. In McDonald v.

Chicago, 561 U.S. 742 (2010), the Court further held that the Second Amendment right to keep

and bear arms is fully applicable to the states by virtue of the Fourteenth Amendment. Id. at 750.

Under Heller and McDonald, lower federal courts adopted a two-step, means-end framework to

analyze challenges to firearms regulations under the Second Amendment. See, e.g., Ezell v. City

of Chicago, 846 F.3d 888, 893 (7th Cir. 2017); see also Kanter v. Barr, 919 F.3d 437, 441–42

(7th Cir. 2019).

Recently, however, in Bruen, the Supreme Court considered the meaning of the Second

Amendment and articulated an analytical framework to determine whether a firearm regulation is

constitutional. The Court again emphasized that certain firearms regulations remain

constitutional, and that its newly articulated framework is "consistent with Heller and

McDonald." Id. at 2122. It held that "when the Second Amendment's plain text covers an

individual's conduct, the Constitution presumptively protects that conduct." Id. at 2126. When

the Second Amendment's plain text protects certain conduct, the government can regulate such

conduct only if it can "affirmatively prove that its firearms regulation is part of the historical

2

tradition that delimits the outer bounds of the right to keep and bear arms." Id. at 2127. (Emphasis added). Otherwise, the court must conclude that the individual's firearm-related conduct is protected because it falls within the Second Amendment's "unqualified command." Id. at 2126 (internal quotations omitted).

The Bruen Court provides two avenues of historical inquiry. The first avenue of inquiry is a "straightforward historical inquiry," which applies when "a challenged regulation addresses a general societal problem that has persisted since the 18th century." Id. at 2131. Under this inquiry, courts must identify a "distinctly similar historical regulation addressing that problem." Id. The second avenue of inquiry is by "analogy." Id. at 2132. Because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," there is not always straightforward correspondence, and unprecedented societal concerns or dramatic technological changes may require a "more nuanced approach." Id. Under these circumstances, the Bruen Court directed courts to consider "historical analogies" to the challenged regulation to determine whether the regulation sufficiently resembles historically acceptable restrictions. Id.

Evaluating whether a historical regulation is a proper analogue for a for a "distinctly modern" firearm regulation requires a determination of whether the two regulations are "relevantly similar." Id. The Bruen Court directed lower courts to centrally consider "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." Id. at 2133. The Court emphasized that "analogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." Id. It requires a "well-established and representative historical

analogue, not a historical <u>twin</u>." <u>Id.</u> (Emphasis in original).

In <u>Atkinson</u>, the Seventh Circuit remanded a civil litigant's as-applied constitutional challenge to § 922(g)(1) for further analysis under <u>Bruen</u>. <u>See</u> 70 F.4th 1018, 1023 (7th Cir. 2023). The plaintiff was convicted of felony mail fraud 24 years earlier and filed his complaint pursuant to 18 U.S.C. § 925A. <u>Id.</u> at 1021–22. Because the district court dismissed his complaint before the Court articulated its "text and history" test in <u>Bruen</u>, and because the parties' appellate briefing did "not grapple with <u>Bruen</u>," the majority opinion in <u>Atkinson</u> remanded the matter "to allow the district court to undertake the <u>Bruen</u> analysis in the first instance." <u>Id.</u> at 1022. The court reasoned that "<u>Bruen</u> leaves no room for doubt: text and history, not a means-end analysis, now define the controlling Second Amendment inquiry." <u>Id.</u> at 1020. It also directed the government to "develop its contention that the plain text of the Second Amendment does not protect felons and other offenders impacted by § 922(g)(1)" on remand, and to "conduct a more substantial historical analysis." <u>Id.</u> at 1024.

The Seventh Circuit instructed the government to develop a record that addresses a series of "interrelated and non-exhaustive questions" which are intended to "help focus the proper analysis on remand." <u>Id.</u> at 1023. These questions are:

1. Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' ... If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in

substance to the restriction imposed by § 922(g) (1).  To answer the question, the district court and the parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

3.    Are there broader historical analogues to § 922(g)(1) during the periods that <u>Bruen</u> emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons?  The parties should not stop at compiling lists of historical firearms regulations and practices.  The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4.    If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)?  On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5.    If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony?  And what evidence can a court consider in assessing whether a particular felony conviction was violent?  For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements?  <u>Bruen</u> shows that these distinctions should also have firm historical support.  <u>See</u> 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights)."

<u>Id.</u> at 1023–24.

The <u>Atkinson</u> court recognized that "the historical analysis required by <u>Bruen</u> will be difficult and no doubt yield some measure of indeterminacy."  <u>Id.</u> at 1024.

In dissent, Judge Wood stated that she would have upheld § 922(g)(1) as constitutional without remand.  <u>Id.</u> at 1025.  She explained that "[g]un ownership and use in this country (both before and after the adoption of the 1787 Constitution) have always been subject to reasonable regulations."  <u>Id.</u> at 1030.  These regulations make up "a vast and diverse array of gun laws stretching from the colonial period, through the Founding Era, through Reconstruction (when the Fourteenth Amendment was added to the Constitution and ultimately made the Second

Amendment applicable to state regulation), up to the present day." Id. at 1033.

According to Judge Wood, this "text, history, and tradition all point in the same direction." Id. Judge Wood determined that the record behind the felon disentitlement statutes "reveals that, since the founding, governments have been understood to have the power to single out categories of persons who will face total disarmament based on the danger they pose to the political community if armed." Id. at 1035. In support, she cited loyalty oath laws, as well as laws that disarmed persons guilty of treason and members of native tribes. Id. While these laws would be unconstitutional today under the First and Fourteenth Amendments, Judge Wood concluded that "they reveal conclusively the scope of governmental power that was understood to exist at the time the Second Amendment was adopted," which included categorical restrictions. Id.

## DISCUSSION

In the instant motion, defendant argues that § 922(g)(1) is unconstitutional as applied under the Second Amendment pursuant to the Supreme Court's recently articulated Bruen standard. This court extensively evaluated whether § 922(g)(1) is unconstitutional on its face under the Bruen standard in its opinion dismissing the indictment in United States v. Prince, No. 22-CR-240, 2023 WL 7220127 (N.D. Ill. Nov. 2, 2023).[1] The court sees no reason to depart from its reasoning and holding as articulated in Prince, which the court adopts in the instant case (although the court notes that defendant makes an as applied, rather than facial, challenge).

The court briefly summarizes the government's response, and its additional arguments

---

[1] The court reached a similar result in several other cases, all of which, including Prince, are on appeal. See, e.g., United States v. Diaz, No. 20 CR 597, 2023 WL 8019691 (N.D. Ill. Nov. 20, 2023); United States v. Anderson, No. 22 CR 594, 2023 WL 7531169 (N.D. Ill. Nov. 13, 2023); United States v. Delaney, No. 22 CR 463, 2023 WL 7325932 (N.D. Ill. Nov. 7, 2023); United States v. Freeman, No. 23 CR 158, 2023 WL 7325934 (N.D. Ill. Nov. 7, 2023); United States v. Salme-Negrete, No. 22 CR 637, 2023 WL 7325888 (N.D. Ill. Nov. 7, 2023); United States v. Daniel, No. 20 CR 002, 2023 WL 7325930 (N.D. Ill. Nov. 7, 2023).

since this court issued its decision in Prince. First, from the government's perspective, § 922(g)(1) remains constitutional under Bruen's text and history test because individuals with felony convictions are not protected by the Second Amendment's textual purview. The government argues that Heller demonstrates that felons do not fall within "the people" contemplated by the Second Amendment, and consequently their "right . . . to keep and bear Arms" is not infringed by § 922(g)(1)'s prohibition on their firearm possession. 554 U.S. 570, 580–81 (2008). Instead, the government maintains that the Second Amendment extends only to ordinary, law-abiding citizens who are "members of the political community." Id. at 580.

The court, however, agrees with defendant that Heller and Bruen did not hold that the Second Amendment categorically protects only law-abiding citizens, despite their repeated use of such qualified language as "law abiding citizens." Similarly, the Seventh Circuit has not resolved the issue. In Atkinson, the court did not decide whether the Second Amendment's plain text presumptively protects the possession of firearms by felons. Instead, it stated that "[w]e cannot resolve the issue without the benefit of more substantial briefing on remand." 70 F.4th 1018, 1023 (7th Cir. 2023).

Prior to Bruen, the Seventh Circuit determined in United States v. Meza-Rodriguez, 798 F.3d 664, 669 (7th Cir. 2015), that "[w]hile some of Heller's language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'" (Internal citations omitted). See also United States v. Skoien, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). The court decided Meza-Rodriguez without the benefit of Bruen, but the Supreme Court specifically stated in Bruen that it did not disrupt Heller, and Heller is central to the court's analysis in Meza-Rodriguez.

In light of Meza-Rodriguez, and the parties' briefing pursuant to Bruen and Atkinson, this court concludes that the government has not met its burden to prove that felons are excluded from "the people" whose firearm possession is presumptively protected by the plain text of the Second Amendment. Yet, the government argues that defendant, not the government, bears the burden to establish that "particular conduct is protected by the plain language of the Second Amendment." Whether the government or defendant bears this burden does not change this court's ruling in Prince, which relied on the Seventh Circuit's determination in Meza-Rodriguez that the Supreme Court did not define the "people" in Heller or limit the Second Amendment's protection to only "law-abiding citizens."

The court agrees with the government that the Supreme Court's reasoning in Bruen that Heller "repeatedly compared the right to keep and bear arms" to "the freedom of speech in the First Amendment." However, the Court explained in Bruen that "[i]n that context [(i.e., the context of free speech)], when the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." Bruen, 142 S. Ct. 2111, 2130 (2022) (internal quotations omitted). Further, "[i]n some cases, that burden includes showing whether the expressive conduct falls outside the category of protected speech." Id. According to the Court, "to carry that burden, the government must generally point to historical evidence about the reach of the First Amendment's protections."[2] Id. (Emphasis in original).

---

[2] Additional evidence that the government bears the burden to demonstrate whether a defendant is a member of "the people" comes from the Court's treatment of the pre-Bruen "two-step" framework for analyzing Second Amendment challenges. At the first step, "the government [would] justify its regulation by establishing that the challenged law regulate[d] activity falling outside the scope of the right as originally understood." Bruen, 142 S. Ct. at 2126 (internal quotations omitted). If, at the first step, "the government [could] prove that the regulated conduct [fell] beyond the Amendment's original scope," then the analysis would end, and "the regulated activity is categorically unprotected." Id. If the historical evidence was inconclusive or suggested that the activity was not categorically unprotected, courts would move to the second step, which required means-end scrutiny. Id. In Bruen, however, the Court determined that "[d]espite the popularity of this two-step approach, it is one step too many." Id. at 2127. Ostensibly, the first step of this two-step framework (in which the government bears the burden) is the foundation for the Bruen standard.

This court also notes that whether certain <u>conduct</u> is constitutionally protected might be a separate question from whether a <u>person</u> is a member of "the people." The Court did not need to examine this potential distinction in <u>Bruen</u>, a civil case where it was undisputed that the petitioners were members of "the people." <u>Id.</u> at 2134 ("It is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people'"). If the government is correct that defendant bears the burden to show that his "conduct" is protected by the Second Amendment, he may bear the burden to prove that his act of "possession" is encompassed by the right to keep and bear arms, similar to how a protestor must prove that the epithets on his poster are protected speech. However, in the instant case, the parties do not dispute whether "possession" of a firearm (the relevant conduct) is protected conduct. Rather, they dispute whether defendant is a member of "the people" who receive the Second Amendment's protection. This inquiry, which depends upon defendant's status as a felon, does not require examining his "conduct" at all. As this court has previously found, defendant in this case is a member of "the people." Other courts in this district have reached the same conclusion. <u>See, e.g.</u>, <u>United States v. Neal</u>, No. 20 CR 335, Dkt. No. 93, at *13–15 (N.D. Ill. Feb. 7, 2024); <u>United States v. Carbajal-Flores</u>, No. 20-cr-00613, 2022 WL 17752395, at *3 (N.D. Ill. Dec. 19, 2022).

Thus, the court next evaluates the government's argument under the second <u>Bruen</u> inquiry: whether § 922(g)(1) "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." <u>Bruen</u>, 142 S. Ct. at 2127. The government does not argue about whether earlier generations addressed the general societal problem of firearm-related violence with similar or materially different means. Rather, the government's argument is based on analogy to the modern-day statutes.

The government first argues that the historical record shows an established tradition of broad legislative authority to disqualify individuals categorically from possessing firearms based on its judgment that certain groups could not be trusted to adhere to the rule of law. The court disagrees. While the court is persuaded that the record shows that the legislature has a longstanding tradition of justifying exclusion from the right to keep and bear arms based on its assessment of that group's risk to the rule of law, the inquiry required by Bruen is not merely whether a dispossession statute's burden is "comparably justified." Bruen also requires courts to consider whether the statute imposes a "comparable burden" on the right itself. Bruen, 142 S. Ct. at 2133 (emphasis added). Although the cited historical record demonstrates this nation's tradition of "comparably justified" categorical dispossession statutes, the government has failed to meet its burden of providing evidence of a similar lifetime dispossession law with a "comparable burden" to § 922(g)(1).

Specifically, this court is not persuaded that the government has met its burden to show a "distinctly similar," or even a "relevantly similar," historical analogue to § 922(g)(1)'s permanent prohibition on firearm possession by felons, which can be lifted only by expungement, federal pardon, or other method of restoring civil rights that lifts the underlying offense from a "conviction" under § 922(g). 18 U.S.C. § 921(a)(20). See also Buchmeier v. United States, 581 F.3d 561 (7th Cir. 2009) (examining certain "method[s] of restoring civil rights" under Illinois law after an individual's state sentence expired). Thus, for example, if a defendant with one felony conviction receives an executive pardon for that conviction, he is no longer a felon with a "crime punishable by imprisonment for a term exceeding one year" under the statute.[3]

---

[3] This court respectfully disagrees with its esteemed colleague in United States v. Johnson, No. 18 CR 00458, 2023 WL 6690388, at *8 (N.D. Ill. Oct. 12, 2023), which noted that, "Once a felony is expunged, 'Illinois law restores all

10

Conversely, loyalty oath laws, which are the strongest analogue to § 922(g)(1), allowed individuals deemed "untrustworthy" to regain their right to keep and bear arms by swearing an oath to a state or the United States, or by renouncing their faith. There is no similar opportunity under § 922(g)(1) for felons to regain their rights after demonstrating their ability to abide by the rule of law. The government argues otherwise by emphasizing the potential "mechanism" in 18 U.S.C. § 925(c), for relief from prohibitions on firearm possession after restoration from the Attorney General, but it acknowledges that Congress has never chosen to activate this mechanism. See Atkinson v. Garland, 70 F.4th 1018, 1035 n. 3 (7th Cir. 2023) (Wood, J., dissenting).

Thus, this court concludes that § 922(g)(1) imposes a far greater burden on the right to keep and bear arms than the historical categorical exclusions from the people's Second Amendment right.

The court next evaluates the government's second type of historical regulations, which it argues are "relevantly similar" to § 922(g)(1): laws that authorize capital punishment and estate forfeiture for certain felonies. According to the government, the law of England leading up to the colonial era authorized capital punishment and estate forfeiture for some, but not all, felony convictions, citing Blackstone. See 4 William Blackstone, Commentaries on the Laws of England at 95 (1769). The First Congress continued this tradition, and made forging or counterfeiting public securities punishable by death. See An Act for the Punishment of Certain Crimes Against the United States, 1 Stat. 112, 115 (1790). As the D.C. Circuit noted in Medina v. Whitaker, 913 F.3d 152, 158 (D.C. Cir. 2019), "it is difficult to conclude that the public, in

---

civil rights . . . including the right to carry a firearm.'" (Quoting United States v. Lloyd, 184 F.3d 695, 699 (7th Cir. 1999)). As noted above, once a felony conviction is expunged, the individual is no longer a felon with a "crime punishable by imprisonment for a term exceeding one year" and, therefore, not covered by § 922(g)(1).

11

1791, would have understood someone facing death and estate forfeiture to be within the scope of those entitled to possess arms."

These dispossession statutes, however, are not "comparably justified" and do not impose a "comparabl[e] burden" to § 922(g)(1).  While this court agrees with the D.C. Circuit in Medina that capital punishment and estate forfeiture laws imposed severe consequences on certain felons, it also agrees with the Third Circuit in Range that these consequences "do[ ] not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition."  Range v. Attn'y General of the U.S., 69 F.4th 96, 105 (3d Cir. 2023).  Thus, in Range, Judge Krause acknowledged in dissent that certain felony offenses were not punishable by death or life imprisonment and, while "the offender was stripped of his then-existing estate, including any firearms," he could "presumably repurchase arms" "upon successfully serving [ ] his sentence and reintegrating into society."  Id. at 127–28.  As the Third Circuit reasoned, "[t]he Government has not cited a single statute or case that precludes a convict who has served his sentence from purchasing the same type of object that he used to commit a crime," nor "cited forfeiture cases in which the convict was prevented from regaining his possession, including firearms (except where forfeiture preceded execution)."  Id. at 105.

Consequently, this court concludes that the government has not met its burden under Bruen to prove this nation's history and tradition of firearm regulation with historical evidence of laws that authorized capital punishment and estate forfeiture for felonies.  Because neither type of historical regulation offered by the government satisfies its burden to show a history and tradition of even "relevantly similar" analogues to § 922(g)(1)'s permanent, categorical firearm dispossession of all felons, the court grants defendant's motion to dismiss the indictment against him under Bruen.

**CONCLUSION**

For the reasons set forth above, defendant's motion to dismiss the indictment (Doc. 17) is

granted.  All other pending motions and dates set by the court are stricken as moot.


       **ENTER:**


Robert W. Gettleman
**Robert W. Gettleman**
**United States District Judge**


**DATE:  February 9, 2024**

13